UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LIQUID NEGOTIATIONS, LLC, | § § | |
| *Plaintiff,* | § § | Civil Action No. |
| v. | § § | Jury Trial Demanded |
| BRUNSWICK CORPORATION, MARINEMAX, INC., BOSTON WHALER, INC. and MERCURY MARINE, INC. | § § § § § § | |
| *Defendants.* | § § | |

# **COMPLAINT**

1. This case involves the sale of a defective, half-a-million-dollar, offshore fishing boat to Liquid Negotiations. As of this filing—over sixteen months since it purchased the boat for $541,888.50—Liquid Negotiations is still unable to use the boat due to crippling motor and steering issues. In fact, the boat cannot even run for more than a few minutes without experiencing complete motor failure. And on several occasions, passengers of the boat were put in danger when the motors and steering failed while over one hundred miles offshore, requiring the boat to idle back to shore for nearly fourteen hours.

2. Liquid Negotiations has provided Defendants ample opportunity to remedy the defects. Rather than take responsibility for a clearly defective vessel, Defendants initially shrugged the issue off as operator error. After several repair shop trips, multiple misdiagnoses, and over 140 phone calls, Defendants are still unable or unwilling to provide a reasonable solution. As such, Liquid Negotiations now files suit against Defendants for violations of the Deceptive Trade Practices Act, negligence, fraud by non-disclosure, and breach of implied warranties.

## PARTIES

3. Liquid Negotiations, LLC, plaintiff, is a limited liability company organized and existing under the laws of the State of Texas. Liquid Negotiation's sole member, Sean Thompson, is domiciled in—and is a citizen of—Texas. Liquid Negotiation's principal place of business is located at 505 Rankin Circle North, Houston, Texas 77073.

4. Brunswick Corporation, a defendant, is a Delaware corporation authorized to do business in Texas. Brunswick Corporation may be served through its registered agent, CT Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201. Brunswick Corporation's principal place of business is 26125 N. Riverwoods Blvd., Suite 500, Mettawa, Illinois, 60045 and is a citizen of that state—where it is headquartered.

5. MarineMax, Inc., a defendant, is a Florida corporation authorized to do business in Texas. MarineMax, Inc. may be served through its registered agent, Corporate Creations Network Inc., located at 5444 Westheimer #1000, Houston, Texas 77056. MarineMax's principal place of business is 2600 McCormick Drive, Suite 200, Clearwater, Florida 33759 and is a citizen of that state —where it is headquartered.

6. Boston Whaler, Inc., a defendant, is a Delaware corporation authorized to do business in Texas. Boston Whaler, Inc. may be served through its registered agent, The Prentice-Hall Corporation System, Inc., located at 211 E. 7th Street, Suite 620, Austin, Texas 78701. Boston Whaler's principal place of business is 100 Whaler Way, Edgewater, Florida 32141 and is a citizen of that state —where it is headquartered.

7. Mercury Marine, Inc., a defendant, is a Delaware corporation that engages in business in Texas, but does not maintain a regular place of business in Texas or a designated agent for service of process and this proceeding arises out of business done in Texas. Mercury Marine

may be served by serving the Texas Secretary of State as its registered agent for service of process, who shall then immediately mail a copy of the process to Mercury Marine's home office address at W6250 Pioneer Road, P.O. Box 1939, Fond du Lac, Wisconsin, 45936—where it is headquartered. Tex. Civ. Prac. & Rem. Code § 17.045. Mercury Marine's principal place of business is also W6250 Pioneer Road, P.O. Box 1939, Fond du Lac, Wisconsin, 45936 and it is a citizen of that state.

## JURISDICTION AND VENUE

8. The Court has jurisdiction over the subject matter of this lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different U.S. states and the amount in controversy exceeds $75,000.00, excluding interest and costs. More specifically, complete diversity exists because Plaintiff's sole member is a citizen of Texas and Defendants, as Delaware and Florida corporations, are citizens of Delaware and Florida. *See* 28 U.S.C. §1332(c)(1). Additionally, none of the Defendants' principal place of business is in Texas.

9. The Court has personal jurisdiction over Defendants because Defendants are conducting business in Texas by, among other things, selling water vessels, motors, and other products to Texas residents and businesses through prominent retail stores, including MarineMax. Finally, Defendants have engaged in wrongful conduct with foreseeable injurious effects within this State, including this District. Such conduct gives rise to jurisdiction in Texas under the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.042.

10. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. More specifically, the defective vessel that is the basis of the suit was sold in Harris County, Texas.

## FACTUAL BACKGROUND

*Purchase of the Boat from MarineMax.*

11.   On or about December 10, 2019, Liquid Negotiations purchased a 2019 Boston Whaler 345CQ bearing the Hull Identification Number of BWCE1296J819 (the "Boat") from MarineMax for $541,888.50.

12.   The purchase was memorialized by a purchase and sale agreement (the "Agreement").

13.   Sean Thompson, as owner of Liquid Negotiations, purchased the Boat from MarineMax's Houston store located at 3001 E NASA Pkwy, Seabrook, Texas, 77586, where a MarineMax sales associate helped Mr. Thompson choose the vessel and electronics package that best suited Mr. Thompson's needs.

14.   At the time, Mr. Thompson explained to MarineMax that he intended to use the Boat to entertain customers and develop business relationships by virtue of offshore fishing trips. Because durability and reliability were essential to the purchase decision, Mr. Thompson, on behalf of Liquid Negotiations, purchased a floor model of the Boat, which MarineMax represented was brand new with less than one hour of motor time.

15.   The Boat houses three Mercury motors, which, as discussed below, have proven to be debilitatingly defective.

16.   In addition, MarineMax sold Liquid Negotiations an upgraded electronics package, which included, among other things, additional displays and upgraded navigation and radar features.

17. At the time MarineMax sold the electronics package, it knew of the Boat's intended use for offshore fishing trips.

*Defects arise during the Boat's first trip.*

18. After purchasing the Boat, several defects immediately arose. The Boat's first offshore trip, on or around December 26, 2019, was an unmitigated disaster. After arriving at a fishing grounds located 130 miles offshore, the Mercury motors began to fail, the display screens stopped working, and steering the boat was rendered nearly impossible. As a result, the trip back to shore lasted some fourteen hours. Much of the return trip occurred in the middle of the night, posing a threat to the safety of all on board.

19. And to add to an already dangerous situation, a non-functioning fuel gauge made it impossible to monitor the Boat's fuel level. The Boat's fuel gauge provided inaccurate and inconsistent distance-until-empty readings, often changing by hundreds of miles (increase and decrease) in a matter of seconds.[1] In fact, the Boat had to be returned to the dock two times after the first hour of it leaving the dock.

20. Several additional defects quickly came to light. By way of example, the Boat's freshwater pump, which is supposed to deliver water to onboard water fixtures, dispenses black water that smells of sewage. Flushing the system between trips does not resolve this issue, indicating the issue is not the product of stagnant water buildup. As a result, an overwhelming sewage smell occurs when the water fixtures are used.

*Defendants' inability and/or unwillingness to fix the Boat's defects.*

21. These issues, among others, forced Mr. Thompson to bring the Boat to MarineMax several times for diagnostics and repairs during the first few months of ownership. During that time,

---

[1] Although the defective gas gauge has since been resolved (after six months of requests to fix it), the existence of the issue reinforces the poor quality of the Boat at the time Liquid Negotiations purchased it.

Mr. Thompson spent countless hours encouraging MarineMax to diagnose and resolve the problems—namely the motor and steering issues. Phone records show more than forty phone calls between Mr. Thompson and MarineMax in the first four months after the Boat's purchase.

22. After inspecting the Boat, MarineMax concluded that two dead batteries were the cause of the motor issues that rendered the Boat effectively inoperable. This diagnosis proved to be misguided, however, as the same motor and steering issues continued. In fact, the same issues prevented the Boat (with new batteries) from even leaving the marina on one of the Boat's next trips—a strong indication that the issue was unrelated to the batteries or improper battery management.

23. After over six months, it became clear MarineMax was unable or unwilling to resolve the Boat's defects. As such, Mr. Thompson turned to the Boat and motor manufacturers—Mercury, Brunswick, and Boston Whaler—to fix the issues with the Boat and motors. In June 2020, Mr. Thompson spoke at length with William Herholz of Boston Whaler about the Boat's pervasive defects and what had (and hadn't) been done to address them. These discussions culminated in Mr. Herholz's suggestion that Mr. Thompson check the fuses on the motors to confirm they were not corroded or damaged. Mr. Thompson also spoke with Nick Stickler, President of Boston Whaler, on two occasions about these issues. Mr. Thompson also left Mr. Stickler two voicemails that were never returned.

24. Following the instructions from Boston Whaler, Mr. Thompson confirmed the relevant fuses were not corroded. Just days later, however, during the Boat's final service trip to MarineMax, MarineMax informed Mr. Thompson that it believed the steering and motor issues were caused by corroded motor fuses and a bent steering rod.

25. Mr. Thompson explained he had checked the fuses for corrosion days earlier and repeatedly requested photographs evidencing the purported issues. MarineMax never provided the requested information. Instead, MarineMax relocated the fuses and replaced the steering rod.

26. Again, MarineMax's diagnosis proved wrong, as the same motor and steering persisted—an indication that neither the steering rod nor the fuses were the cause of the Mercury motor defects.

27. Motor failures on the Boat's most recent offshore trip, which occurred on or around July 17, 2020, again put those on board in harm's way. Like the first offshore trip, the Boat's motor and steering repeatedly malfunctioned, forcing the passengers to return seventy-three miles to shore at idle speed in the middle of a heavily trafficked portion of the ship channel. At one point, the motors shut down as a cargo barge navigated in close proximity to the Boat. This occurred at 11:00 p.m. while attempting to make a turn toward shore.

28. Notably, these defects continue to materialize after over sixteen months of "repairs" and misdiagnoses by Defendants and more than 120 phone calls with representatives from Defendants. Having lost all confidence in the safety of the Boat and Defendants' ability to address its defects, Mr. Thompson has been unable to utilize the Boat since it was purchased over a year ago. During that time, Liquid Negotiations incurred over $10,000 in paid charter costs as a result of the Boat making at least eight trips to MarineMax's shop over a period of less than seven months. And nearly $10,000 in storage fees have been incurred to store a boat that remains effectively inoperable over a year after its purchase.

29. Mr. Thompson ultimately learned that the persistent issues described above likely did not come as a surprise to MarineMax. In fact, months before Liquid Negotiations purchased the

"new" Boat, MarineMax submitted a warranty claim to Mercury for issues arising from the Boat's steering joystick.

30. Further, MarineMax apparently submitted a second warranty claim later in 2019, this time for issues related to the Boat's lower unit. Mercury rejected both warranty claims.

31. MarineMax never informed Plaintiff of either warranty claim before it sold the Boat. On the contrary, despite it being aware of multiple issues with the Boat, MarineMax represented that the Boat was brand new and fully functional.

32. Defendants have been afforded several opportunities to remedy the above-described defects but they have proved unwilling and/or unable to do so.

33. As a result, over a year since the Boat's purchase, the Boat cannot even safely leave the marina.

34. Unable to obtain any substantive cooperation from Defendants with regard to repairs to the Boat's defects, Plaintiff sent Defendants a demand and notice letter pursuant to the Texas Deceptive Trade Practices Act ("DTPA") as a final effort to avoid court intervention. A true and correct copy of the notice letter is attached hereto as **Exhibit A**. Unfortunately, however, the defects remain unaddressed and Plaintiff has no choice but to file suit against Defendants for DTPA violations, negligence, fraud, and breaches of warranty.

## CAUSES OF ACTION

**Count 1: Violation of the Texas Deceptive Trade Practices Act against Defendants**

35. Plaintiff is a consumer under Section 17.45(4) of the Texas Business and Commerce Code.

36. Defendants are entities that may be sued under the DTPA.

37. Defendant MarineMax engaged in false, misleading, and/or deceptive acts or practices that Plaintiff relied upon to its detriment. Specifically, MarineMax violated Sections 17.46(b)(6),(7), 13, and (24). Additionally, Defendants violated Sections 17.50(a)(2),(3) of the DTPA.

38. Defendant MarineMax violated Section 17.46(b)(6) of the DTPA by representing that goods were original or new when they were deteriorated, reconditioned, reclaimed, used, or secondhand. Specifically, when it sold the Boat to Plaintiff, Defendant MarineMax represented the Boat was new when in fact there had been two warranty claims that suggest the Boat, or components of the Boat, had been used. As a direct and proximate result of Defendant MarineMax's misrepresentations, Plaintiff suffered economic and mental anguish damages. Additionally, because MarineMax acted intentionally and knowingly, Plaintiff is entitled to recover treble economic and mental anguish damages under Section 17.50(b)(1) of the DTPA.

39. Defendant MarineMax violated Section 17.46(b)(7) of the DTPA by representing that goods were of a particular standard, quality, or grade, or that goods were of a particular style or model. Specifically, when it sold the Boat to Plaintiff, Defendant MarineMax represented the Boat and its components were brand new, high quality, and fully functional. However, the Boat and its components have failed to perform their basic functions for over a year. As a direct and proximate result of MarineMax's misrepresentations, Plaintiff suffered economic and mental anguish damages. Additionally, because MarineMax acted intentionally and knowingly, Plaintiff is entitled to recover treble economic and mental anguish damages under Section 17.50(b)(1) of the DTPA.

40. Defendant MarineMax violated Section 17.46(b)(13) of the DTPA by knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair

service. Specifically, MarineMax represented that corroded fuses and a bent steering rod needed repair despite the fact that Mr. Thompson inspected the Boat for these issues days before and saw no evidence of damage or corrosion. When Mr. Thompson requested documentation and photographs related to MarineMax's work, MarineMax refused to provide anything. As a result of these misrepresentations, Plaintiff suffered economic and mental anguish damages. Additionally, because MarineMax acted intentionally and knowingly, Plaintiff is entitled to recover treble economic and mental anguish damages under Section 17.50(b)(1) of the DTPA.

41. Defendant MarineMax violated Section 17.46(b)(24) of the DTPA by failing to disclose that two warranty claims had been made against the Boat. At the time MarineMax sold the Boat, it knew said warranty claims existed and failed to disclose the same to induce Plaintiff into purchasing the Boat. Had Plaintiff known two warranty claims had been made against the Boat, Plaintiff would not have entered into the transaction. As a direct and proximate result of MarineMax's misrepresentations, Plaintiff suffered economic and mental anguish damages. Additionally, because MarineMax acted intentionally and knowingly, Plaintiff is entitled to recover treble economic and mental anguish damages under Section 17.50(b)(1) of the DTPA.

42. Defendants violated Section 17.50(a)(2) by breaching the implied warranty of merchantability. MarineMax further violated Section 17.50(a)(2) by breaching the implied warranty of fitness for a particular purpose and the implied warranty of good & workmanlike services. The factual allegations supporting these claims are described in detail below. As a direct and proximate result of Defendants breaches, Plaintiff suffered economic and mental anguish damages. Additionally, because Defendants acted intentionally and knowingly, Plaintiff is entitled to recover treble economic and mental anguish damages under Section 17.50(b)(1) of the DTPA.

43. Defendants violated Section 17.50(a)(3) of the DTPA by engaging in unconscionable acts or action that took advantage of Plaintiff's lack of knowledge, ability, experience, or capacity to an unfair degree. More specifically, Defendants and their technical experts attempted to circumvent their obligation to cure pervasive defects by shifting the blame to Plaintiff. As a direct and proximate result of Defendants' conduct, Plaintiff suffered economic and mental anguish damages. Additionally, because Defendants acted intentionally and knowingly, Plaintiff is entitled to recover treble economic and mental anguish damages under Section 17.50(b)(1) of the DTPA.

**Count 2: Breach of Implied Warranty of Merchantability against Defendants**

44. Defendants, merchant sellers under Section 2.314(a) of the Texas Business and Commerce Code, sold the Boat and its motors to Plaintiff.

45. The Boat and/or the Boat's motors are unmerchantable because they are not fit for ordinary purposes. Specifically, the Boat and/or motors are intended for offshore fishing trips, however defects have made such trips impossible. In fact, the Boat cannot even leave the dock. The Boat and/or motors were unmerchantable when they left Defendants' possession.

46. Plaintiff notified Defendants of their breach and provided them an opportunity to cure. Defendants failed to cure their breach, causing Plaintiff to suffer injury.

**Count 3: Negligence against Defendants**

47. Defendants owed Plaintiff a duty to provide Plaintiff with a Boat and motors that could be used for a particular purpose without persistent defects that render the Boat inoperable after just minutes of powering up the motors.

48. Defendants failed to provide a Boat and motors capable of performing the basic functions of a watercraft. Defendants have failed to fix these substantial defects for over a year.

49. Said failure is a breach of Defendants' duties to Plaintiff. As a direct and proximate result of Defendants' breaches of its duties, Plaintiff has suffered and stands to continue suffering economic damages.

**Count 4: Breach of Implied Warranty of Fitness for a Particular Purpose against MarineMax**

50. MarineMax sold the Boat and upgraded electronics package to Plaintiff with knowledge that Plaintiff was buying the Boat for the particular purpose of offshore fishing trips.

51. Plaintiff relied on MarineMax's judgment to select the Boat and upgraded electronics package for this purpose. MarineMax delivered goods that were unfit for Plaintiff's known particular purpose, as the Boat is unable to run without experiencing motor failure.

52. Plaintiff notified MarineMax of MarineMax's breach, which MarineMax has failed to cure. As a result of MarineMax's breach, Plaintiff has suffered injury.

**Count 5: Breach of Implied Warranty of Good & Workmanlike Services against MarineMax**

53. MarineMax sold repair services to Plaintiff on several occasions. The services consisted of repair and modification services on the Boat. MarineMax did not perform the services in a good and workmanlike manner and as a result, Plaintiff has been injured.

**Count 6: Fraud by Nondisclosure against MarineMax**

54. MarineMax concealed from or failed to disclose that two warranty claims had been made against the Boat. MarineMax's non-disclosure was made at the MarineMax Houston location on or around December 10, 2019. MarineMax had a duty to disclose the two warranty claims, as such information was material to the purchase of a purportedly new vessel.

55. MarineMax knew Plaintiff was unaware of the warranty claims and Plaintiff did not have an equal opportunity to discover the two warranty claims. MarineMax was deliberately silent about the warranty claims when it sold the Boat to Plaintiff.

56. By failing to disclose the warranty claims, MarineMax intended to induce Plaintiff into purchasing the Boat. Relying on MarineMax's nondisclosure, Plaintiff purchased the Boat with persistent defects. Plaintiff has suffered financial harm due to its purchase of the Boat without knowledge that two warranty claims had been made against it.

## CONDITIONS PRECEDENT AND ATTORNEYS' FEES

57. All conditions precedent have occurred or have been performed.

58. As a result of Defendants' actions as set forth above, Plaintiff has been required to retain the law firm of BoyarMiller to prosecute the claims set forth herein and have and will incur reasonable and necessary attorneys' fees and expenses in pursuing these and potentially other claims.

59. Accordingly, pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code, Sections 17.50(c) & (d) of the Texas Business & Commerce Code, or any other state or federal law, Plaintiff seeks recovery of all reasonable and necessary attorneys' fees and expenses incurred in prosecuting it claims in this proceeding.

## PRAYER

Plaintiff, Liquid Negotiations, LLC, asks the Court to enter a judgment against Brunswick Corporation, MarineMax, Inc., Boston Whaler, Inc., and Mercury Marine, Inc., defendants, and award Plaintiff:

a) all actual and/or equitable damages, including money damages and mental anguish damages;

b) reasonable attorneys' fees and expenses to which it might be entitled;

c) pre-judgment and post-judgment interest; and

d) all other relief to which it is justly entitled.

## **DEMAND FOR JURY TRIAL**

Liquid Negotiations demands a trial by jury of all counts so triable.

Dated: April 14, 2021

Respectfully Submitted,

By: /s/ *Chris Hanslik*
Chris Hanslik
Attorney-in-Charge
Texas Bar No. 00793895
Federal ID No. 19249
chanslik@boyarmiller.com
2925 Richmond Avenue, 14th Floor
Houston, Texas 77027
Telephone: (713) 850-7766
Facsimile: (713) 552-1758

OF COUNSEL:
Zach Kleiman
Texas Bar No. 24106157
Federal ID No. 3496521
zkleiman@boyarmiller.com
Kirby Grove
2925 Richmond Avenue, 14th Floor
Houston, Texas 77027
Telephone: (713) 850-7766
Facsimile: (713) 552-1758

**COUNSEL FOR PLAINTIFF**